Versión para imprimir

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Jorge Colón Ortiz <br>      Peticionario <br><br> v. <br><br> Asociación de Condómines Borinquen Towers I, Junta de Directores del Condominio Borinquen Towers <br>      Recurridos <br><br> _____ <br><br> Consejo de Titulares y/o Junta de Directores de la Asociación de Condómines del Condominio Playa Dorada <br> Recurridos <br>      Recurrida <br><br>                v. <br><br> Yolanda Candelario <br>      Peticionaria | Certiorari <br><br> 2012 TSPR 102 <br><br>  185 DPR ____ |

Número del Caso: CC-2010-277
                cons.
              CC-2010-616

Fecha: 14 de junio de 2012


Tribunal de Apelaciones:

          Región Judicial de San Juan

Abogados de la Parte Peticionaria:

CC-2010-277    Lcdo. Pedro José Cruz Soto
            Lcda. Brenda L. Cordero Acabá

CC-2010-616
            Lcdo. Charles Hey Maestre

Abogados de la Parte Recurrida:

CC-2010-277  Lcdo. Ángel Vital Vázquez
            Lcdo. Roberto A. Rivera Ruiz

CC-2010-616  Lcdo. Ángel L. Tapia Flores


Materia: Ley de Condominios – Agente administrador del condominio; contratos de mandato, trabajo y arrendamiento de servicios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Jorge Colón Ortiz<br>Peticionario<br><br>v.<br><br>Asociación de Condómines Borinquen Towers I, Junta de Directores del Condominio Borinquen Towers<br>Recurridos<br>_____<br>Consejo de Titulares y/o Junta de Directores de la Asociación de Condómines del Condominio Playa Dorada<br>Recurridos<br><br>v.<br><br>Yolanda Candelario<br>Peticionaria | CC-2010-277<br><br><br><br><br><br>cons.<br><br><br><br><br>CC-2010-616 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada señora Fiol Matta

En San Juan, Puerto Rico, a 14 de junio 2012.

¿Es el agente administrador de un inmueble bajo el régimen de propiedad horizontal un mandatario del Consejo de Titulares? Estos recursos consolidados nos brindan la oportunidad de examinar esa relación en toda su complejidad y, en particular, la interacción que en ella se da entre los contratos de mandato, trabajo y arrendamiento de servicios.

I.

A.

En el primero de los casos ante nuestra consideración, el señor Jorge Colón Ortiz suscribió un contrato con el Consejo de Titulares del Condominio Borinquen Towers I para prestar servicios remunerados como administrador de dicha comunidad sometida al régimen de propiedad horizontal y de la cuál él era condómino. Por virtud de ese contrato suscrito el 16 de octubre de 1996, el señor Colón Ortiz laboraría seis horas diarias con un horario fijo de 7:00am a 1:00pm y un salario mensual de $650, así como una compensación de $50 mensuales para diligencias oficiales del condominio. No obstante, de 1996 al 2000, el peticionario laboraba 40 horas semanales y devengaba un salario de $1,500 mensuales.[1] Finalmente, el contrato podría renovarse anualmente de manera tácita por un plazo idéntico, "siempre y cuando [cumpliera] con las reglas y deberes que se le asignen".[2] Durante los cuatro años que fungió como administrador del condominio, el señor Colón Ortiz no fue objeto de amonestación alguna y, en consecuencia, el contrato fue renovado automáticamente para los años 1997, 1998 y 1999.

Según el contrato, el condominio retuvo "los servicios del Sr. Jorge Colón Ortiz como Administrador" y le asignó,

---

[1] Determinaciones de Hechos, Sentencia del Tribunal de Primera Instancia, a la pág. 2; Apéndice petición de *certiorari*, a la pág. 38.

[2] Sentencia del Tribunal de Apelaciones, a la pág. 1; Apéndice petición de *certiorari*, a la pág. 2.

entre otras funciones, "[a]tender todo lo relacionado con el buen gobierno, administración[,] vigilancia y funcionamiento del condominio, y en especial, todo lo relacionado a las cosas o elementos de uso común y los servicios generales".[3] Muchos de los deberes y las facultades del peticionario especificados en el contrato corresponden a la gestión típica de un agente administrador. No obstante, el Tribunal determinó, como cuestión de hecho, que la posición del demandante no requería el ejercicio de discreción ni tampoco conllevaba la supervisión de empleados.[4]

El 17 de mayo de 2000, el peticionario se reportó al Fondo del Seguro del Estado tras sufrir un accidente en el trabajo que se produjo mientras laboraba con el contenedor de basura del condominio. Ese mismo día, la Junta de Directores advino en conocimiento de la determinación del

---

[3] Contrato del 16 de octubre de 1996, a la pág. 1; Apéndice petición de *certiorari*, a la pág. 50. Según el contrato, la Junta de Directores también podía delegarle un sinnúmero de tareas al Administrador: dirigir los asuntos financieros relativos a las recaudaciones y pagos; atender las deudas de los titulares; mantener una cuenta bancaria a nombre del condominio; atender violaciones al reglamento; responder por la conservación y funcionamiento de las diversas dependencias del condominio, fundamentalmente las de uso común; preparar, mantener y radicar todos los récords e informes requeridos por las leyes y el Reglamento; cumplir y hacer cumplir las normas y acuerdos del Consejo de Titulares y la Junta de Directores; atender la conservación del condominio y disponer las reparaciones ordinarias que sean necesarias, adoptando las medidas pertinentes; y cuidar que se lleve al día el libro de titulares. De igual forma, tendría "[t]odas las demás facultades que le sean asignadas por la [Junta de Directores]". *Id.*

[4] Determinaciones de Hechos, Sentencia del Tribunal de Primera Instancia, a la pág. 2; Apéndice petición de *certiorari*, a la pág. 38.

Fondo de ofrecerle al señor Colón Ortiz tratamiento médico en descanso. Luego, el 3 de agosto de 2000, el Fondo ordenó continuar el tratamiento mientras trabajaba. El 17 de octubre de ese año, el peticionario fue dado de alta.

Mientras tanto, apenas siete días después del accidente del peticionario, se celebró una asamblea del Consejo de Titulares del Condominio Borinquen Towers I. En esa reunión, se decidió, por unanimidad, no renovar el contrato del señor Colón Ortiz que, casualmente, vencía el 17 de octubre de ese año, día en que el peticionario fue dado de alta.

El 15 de noviembre de 2000, el señor Colón Ortiz presentó una demanda ante el Tribunal de Primera Instancia por despido injustificado y en violación a la reserva de empleo establecida en el artículo 5-A de la Ley Núm. 45 de 18 de abril de 1935, según enmendada.[5] En su contestación a la demanda, el condominio alegó, entre otras defensas, que hubo justa causa para el despido, que no había relación entre el despido y el accidente del señor Colón Ortiz y que la decisión de no ratificar al administrador fue hecha por unanimidad en el Consejo de Titulares. En cuanto a las razones para no renovar el contrato del peticionario, el condominio sostuvo que el demandante había cometido múltiples irregularidades antes de su supuesto accidente.[6] Posteriormente, el condominio alegó que, "[h]abiéndo sido

---

[5] Ley de Accidentes del Trabajo, 11 L.P.R.A. sec. 1 *et seq.*

[6] Sentencia del Tribunal de Apelaciones, a las págs. 3-4; Apéndice petición de *certiorari*, a las págs. 4-5.

el demandante contratado por término determinado", no estaba protegido por la Ley Núm. 80 de 30 de mayo de 1976, según enmendada.[7]

El 5 de octubre de 2009, el foro de instancia declaró con lugar la demanda. Al aquilatar la prueba recibida, concluyó que la relación entre el señor Colón Ortiz y el condominio era, como cuestión de hecho, de naturaleza obrero-patronal. Resolvió, además, que el condominio no logró refutar la presunción de despido injustificado que establece la Ley Núm. 80 y que no cumplió con la reserva de empleo establecida en el artículo 5-A de la Ley Núm. 45. El Tribunal de Primera Instancia ordenó el pago de $187,677,65 por concepto de mesada ($4,038.45), licencia de vacaciones y enfermedad ($15,639.20), salarios dejados de percibir entre agosto 2000 a febrero 2009 ($153,000.00) y daños ($15,000), así como $10,000 en honorarios de abogados.

Inconforme con esa decisión, el condominio recurrió al Tribunal de Apelaciones alegando, principalmente, que entre el señor Colón Ortiz y el condominio no había una relación obrero-patronal, por lo que no procedía indemnización alguna bajo las leyes laborales. El foro apelativo examinó la figura del agente administrador y su interacción con los contratos de mandato, de trabajo y arrendamiento de servicios. Concluyó que el agente administrador es un mandatario, pues la Ley de Condominios autoriza su destitución en cualquier momento por la sola voluntad del

---

[7] *Id.* a la pág. 4; Apéndice petición de *certiorari*, a la pág. 5.

Consejo de Titulares e impone al administrador el deber de rendir cuentas al final de su gestión. Resolvió entonces que la legislación protectora del trabajo no aplica al agente administrador y revocó al Tribunal de Primera Instancia. Para el foro intermedio, el que la relación entre el señor Colón Ortiz y el condominio fuese de subordinación y se le remunerase por sus servicios no era suficiente para concluir que el peticionario realmente era un empleado, pues ambas circunstancias eran compatibles con el contrato de mandato.

El señor Colón Ortiz presentó entonces su recurso ante este Tribunal alegando, en esencia, que su vínculo con el condominio era "una clara relación obrero-patronal".[8] Según el señor Colón Ortiz, un mandatario se obliga a prestar un servicio o efectuar cualquier otra gestión o negocio jurídico a nombre o por encargo de otra, gestión que, aunque puede ser gratuita o retribuida, se basa en la confianza entre las partes y conlleva un traspaso de autoridad. Sostiene así mismo que lo esencial del contrato de mandato es la representación pues ésta permite convertir la ausencia real del mandante en presencia jurídica. Así, lo fundamental de dicho contrato es la posibilidad de obrar por cuenta ajena y realizar actos jurídicos en nombre de otro cuya personalidad asume el mandatario.[9] Esta facultad de representación del mandante por el mandatario conlleva

---

[8] Petición de *certiorari*, a la pág. 7.

[9] *Id*, a la pág. 8.

otro elemento esencial al mandato, la discreción para obrar.

Sin embargo, el peticionario expone que no ejercía discreción alguna en el desempeño de sus labores y, si bien su posición estaba "designada" como "Administrador", "no es menos cierto que las funciones que [realizaba] para el Condominio eran típicas de un empleado asalariado".[10] Como ejemplo de esto, recalca que el accidente que sufrió en mayo de 2000 se debió a que estaba moviendo un contenedor de basura. En otras palabras, el peticionario alega que, independientemente del nombre por el cual se le designa en su contrato, su realidad cotidiana asemeja su situación más a la de un empleado que a la de un agente administrador. Por último, el peticionario reclama que no debe ser privado de las protecciones de la legislación laboral, pues nuestro ordenamiento exige una lectura restrictiva en contra de la exclusión del trabajador y liberal a favor de la aplicación de sus disposiciones.

El 22 de octubre de 2010 expedimos el auto. En su alegato, la parte recurrida se reafirma en que el Tribunal de Apelaciones no erró al resolver que el peticionario era un mandatario y que dicha conclusión está en sintonía con la doctrina científica.

B.

En el segundo de los casos consolidados, la peticionaria, señora Yolanda Candelario, trabajó por seis

---

[10] *Id.*

años, hasta el 17 de noviembre de 2004, como administradora del condominio Playa Dorada, siendo ella una de sus titulares. Como administradora, la señora Candelario supervisaba a la secretaria, así como a la supervisora y los trabajadores de mantenimiento del condominio, un total de siete personas. También supervisaba al personal contratado de seguridad, a contratistas que proveían servicios a la piscina y a la planta de emergencia, así como servicios de jardinería, entre otros.[11] Es decir, "[l]levaba a cabo las funciones de Administradora del Condominio" y se reportaba directamente ante la Junta de Directores.[12] Según fue admitido por el condominio, la señora Candelario nunca fue objeto de amonestación, recibía un salario de $1,125 quincenales, del cual se le deducían seguro social y contribuciones, tenía derecho a 15 días por concepto de vacaciones y 15 días por licencia de enfermedad, así como un bono de navidad equivalente al 2% de su salario, hasta un máximo de $200.[13] Las funciones de la señora Candelario, según descritas por ella, eran "estar a cargo de la oficina, de los empleados, supervisar [a] alrededor de ocho (8) empleados, a cargo de todos los

---

[11] Determinación de Hecho Núm. 2, Sentencia del Tribunal de Primera Instancia, a las págs. 6-7; Apéndice petición de *certiorari*, a las págs. 15-16.

[12] Determinación de Hecho Núm. 3, *Id*, a la pág. 7; Apéndice petición de *certiorari*, a la pág. 16.

[13] Según la señora Candelario, al comenzar sus labores como Administradora devengaba un salario de $1,500 mensuales con $200 de *car allowance*, el que eventualmente fue elevado a $2,250 mensuales y $250 de *car allowance*. Transcripción del

suplidores que le daban servicio al condominio, de los condóminos, que cuando tuvieran algún problema en sus apartamentos [ella] tenía que ir a inspeccionarlo",[14] lo cual resultaba en que estaba más en el "*field*" que en su oficina.[15] Indicó que además de seguro social y contribuciones, le hacían descuentos de seguro de choferes, desempleo e incapacidad, y que el condominio le entregaba un formulario W-2 para sus planillas.[16] Su horario de trabajo era de 8:00am a 5:00pm.

Según el reglamento del condominio, el administrador "será nombrado, por el Consejo de Titulares, por mayoría de votos, pudiendo ser una corporación o un individuo para asegurar la administración apropiada del condominio. Igualmente, el Consejo de Titulares [podrá] removerlo de su cargo, también por mayoría de votos".[17] En cuanto a sus

---

testimonio de la señora Candelario, Apéndice petición de *certiorari*, a las págs. 447-448.

[14] *Id*, a las págs. 444-445.

[15] *Id*, a la pág. 445.

[16] *Id*, a la pág. 448.

[17] Artículo 5.1 del Reglamento del Condominio Playa Dorada. El Reglamento también dispone que el administrador prestará fianza, si así se lo requiere el Consejo de Titulares. En cuanto a los deberes y obligaciones del administrador, el Reglamento establece que: <u>autorizará todos los contratos y demás documentos otorgados en nombre del Condominio</u>; cobrará todas las cantidades debidas y pagará las deudas; <u>en nombre del condominio empleará y despedirá a todo personal, fijará las horas de trabajo y la compensación para el mismo</u>; velará por el cumplimiento del Reglamento; mantendrá todos los récords y preparará todos los informes, incluyendo las minutas escritas de todas las reuniones del Consejo de Titulares y de la Junta de Directores; preparará un presupuesto anual para someterse a la reunión anual del Consejo; establecerá y mantendrá una cuenta bancaria a

facultades, el reglamento también dispone que éstas "podrán ser revocadas, modificadas o ampliadas por el Consejo de Titulares en reunión celebrada al efecto".[18]

En una asamblea celebrada el 14 de noviembre de 2004, el Consejo de Titulares, sin ofrecer explicaciones, destituyó a la señora Candelario de su cargo.[19] En esa misma reunión, se eligió una nueva Junta de Directores que tomó posesión pocos días después. En ausencia de su Presidente, quien se encontraba fuera del país, la Junta saliente se reunió y tomó "la decisión de autorizar pagos por concepto de mesada, vacaciones, bono y salario a favor de la demandada".[20] Estas decisiones de la Junta saliente "fueron acorde con la práctica existente en el Condominio para la toma de posesión de una nueva Junta y la entrega de los asuntos administrativos a ésta".[21] El desembolso autorizado por la Junta saliente consistió de las siguientes partidas: un cheque por $7,619.77 por concepto de mesada; otro por $1,699.69 por concepto de vacaciones acumuladas; otro

---

nombre del Consejo; adoptará reglas para el mejor uso de las facilidades del condominio; "[e]n general, ejecutará los poderes y cumplirá con todos los deberes del Consejo Titulares y/o los deberes señalados a la Junta de Directores excepto aquellos específicamente reservados a los Titulares y/o de la Junta por las leyes del Estado Libre Asociado de Puerto Rico por el presente Reglamento".

[18] Artículo 5.1(n) del Reglamento.

[19] Sentencia del Tribunal de Apelaciones, a la pág. 6; Apéndice petición de *certiorari*, a la pág. 575.

[20] *Id*, citando la Determinación de Hecho Núm. 5, Sentencia del Tribunal de Primera Instancia.

[21] *Id*, citando la Determinación de Hecho Núm. 6, Sentencia del Tribunal de Primera Instancia.

cheque por $790.82 también por vacaciones; y un cheque por $184.70 de bono de navidad. El total de los pagos emitidos fue de $10,294.98.

El 4 de enero de 2005, la nueva Junta de Directores demandó a la señora Candelario en cobro de dinero, por la cantidad de $10,412.50.[22] En apoyo a esa demanda, los peticionarios adelantaron varios argumentos. En primer lugar, adujeron que el desembolso autorizado por la Junta saliente era ilegal pues la señora Candelario "no tenía derecho a los beneficios provistos a los obreros".[23] Es decir, que, por la naturaleza de su cargo y sus funciones, no estaba cubierta por la legislación protectora del trabajo, y no era acreedora a pago alguno en concepto de mesada, vacaciones, bono de navidad o salarios adeudados. En segundo lugar, sostuvieron que el desembolso de $10,294.98 autorizado por la Junta saliente excede el límite de $5,000 permitido a la Junta en casos de transacciones extrajudiciales, requiriéndose autorización del Consejo de Titulares para cualquier suma mayor.

Por su parte, la señora Candelario negó que debiera la cantidad reclamada, considerando que ésta respondía al pago de la mesada y demás liquidaciones a las que tenía derecho. En cuanto a la postura del condominio de que los cheques emitidos excedían el límite de $5,000 establecido por la

---

[22] No surge con claridad del expediente las razones para la diferencia entre el total de pagos emitidos y la cantidad reclamada en la demanda.

[23] *Id*, a la pág. 2; Apéndice petición de *certiorari*, a la pág. 571.

Ley de Condominios, la señora Candelario adelantó dos teorías. En primer lugar, que la disposición de la Ley que establece dicho límite se refiere exclusivamente a reclamaciones judiciales o extrajudiciales y en este caso la Junta realizó dicho desembolso sin que la peticionaria hiciera reclamación alguna. En segundo lugar, y en la alternativa, que si fuera aplicable el límite de $5,000, éste se referiría únicamente al pago que recibió por concepto de mesada pues los demás pagos fueron por cantidades inferiores a $5,000. Finalmente, presentó una reconvención reclamando el pago de $299.25 en concepto de remanente de la mesada.

El condominio también alegó que la Ley Núm. 80 no cubría a la señora Candelario pues a ella se le había contratado por un término fijo de un año, mientras que la Ley aplica únicamente a los empleados por término indeterminado. Además, alegó que la peticionaria no tenía derecho a la mesada porque, al ser administradora, era mandataria del condominio y no empleada. Por el contrario, la señora Candelario alegó que era empleada del condominio, que fue despedida sin justa causa y que, aunque su contrato era anual, se había generado una expectativa de continuidad en el empleo que la convirtió en empleada regular por tiempo indeterminado protegida por la Ley Núm. 80.

El Tribunal de Primera Instancia declaró sin lugar la demanda, manifestando que "quedó plenamente convencido […] de que la relación entre la parte demandante y su administradora se basó a lo largo de los años en que se dio

dicha relación, en una de empleada-patrono".[24] Apoyó dicha conclusión en la "naturaleza de la relación[,] […] sus términos y condiciones de empleo y con el trato contributivo y de beneficios que se le dio en todo momento [a la peticionaria]".[25] Por tanto, al determinar que la señora Candelario era una empleada del condominio y que no hubo justa causa para su despido, concluyó que los pagos emitidos por la Junta saliente constituían una obligación legal con la peticionaria y su pago no requería autorización del Consejo de Titulares. De igual manera, declaró sin lugar la reconvención, dado que la peticionaria no presentó prueba que demostrara que el condominio le debía cantidad alguna por concepto de mesada.

El condominio recurrió al Tribunal de Apelaciones y éste revocó la Sentencia del foro primario. Concluyó el tribunal que la señora Candelario no era empleada sino contratista del condominio, por lo cual estaba excluida de las protecciones de la Ley Núm. 80. De igual forma, resolvió que la Junta saliente actuó *ultra vires* al emitir cheques por una cantidad mayor a $5,000 sin la autorización del Consejo de Titulares.

En el recurso que atendemos, la peticionaria alega que el Tribunal de Apelaciones erró al concluir que ella era mandataria del Consejo de Titulares y, como tal, estaba excluida de la legislación laboral. Señala la señora

---

[24] Sentencia del Tribunal de Primera Instancia, a la pág. 11; Apéndice petición de *certiorari*, a la pág. 20.

[25] *Id.*

Candelario que el condominio deducía de su salario pagos al seguro social, retenía contribuciones y denominaba su remuneración como salario. Además, tenía derecho a 15 días de vacaciones e igual periodo en caso de enfermedad, recibía bono de navidad, y el Departamento del Trabajo y Recursos Humanos la clasificó como empleada para efectos de los beneficios de desempleo. También reitera que el pago emitido por la Junta saliente no fue *ultra vires*, pues el límite de $5,000 que establece la Ley se refiere a reclamaciones judiciales o extrajudiciales y no a obligaciones legales que la propia Junta decidió cumplir sin que ella reclamara pago alguno. Por su parte, el condominio argumenta que el que se dedujeran pagos de seguro social y se retuvieran contribuciones no convirtió a la peticionara en empleada, más aún cuando fue ella, como administradora del condominio, quien implantó dicha práctica para todos los empleados y se incluyó entre estos.

El 21 de enero de 2011 expedimos el auto de *certiorari* en el caso CC-2010-616 y lo consolidamos con el caso CC-2010-277. Procedemos a resolver ambas controversias.

II.

El régimen de propiedad horizontal se adoptó en nuestra jurisdicción con una doble finalidad, a saber, proveerle a las personas la posibilidad de disfrutar el derecho a la propiedad plena e individual de un inmueble y, a la vez, maximizar el uso del escaso terreno disponible en

el país.[26] La propiedad plena e individual de un apartamento coexiste entonces con la de otros dueños, mientras se comparten unas áreas comunes que pertenecen a todos como parte de la comunidad.

El titular individual es responsable principalmente de su propio apartamento, que le pertenece privativamente como cualquier otra finca sujeta a derechos reales como el de propiedad. En cuanto al uso y mantenimiento de los elementos comunes, así como los asuntos generales relacionados a la vida del condominio, la responsabilidad recae sobre la totalidad de la comunidad. Para ello, la Ley Núm. 103 de 5 de abril de 2003, mejor conocida como la Ley de Condominios,[27] establece el Consejo de Titulares, compuesto por la totalidad de los titulares individuales, como la autoridad suprema del condominio. Ahora bien, nuestro ordenamiento reconoce las dificultades prácticas que presenta el que el Consejo de Titulares se encargue de los asuntos de día a día de un condominio. Por eso, la Ley dispone que cuando concurran más de quince titulares, se elegirá una Junta de Directores compuesta por vecinos del condominio.[28]

Según el artículo 38 de la Ley de Condominios, la Junta de Directores estará compuesta, como mínimo, por un Presidente, un Secretario y un Tesorero, todos los cuales,

---

[26] Consejo de Titulares v. Portal de Sofía, Inc., 2011 T.S.P.R. 76, a las págs. 7-8.

[27] 31 L.P.R.A. sec. 1291 et seq.

[28] 31 L.P.R.A. sec. 1293b(a)(1).

necesariamente, tienen que pertenecer al Consejo de Titulares.[29] De igual forma, el mismo artículo 38 provee para la selección de un "agente administrador, quien podrá no pertenecer a la comunidad de titulares y en quien el Consejo de Titulares, el Director o la Junta de Directores podrá delegar las facultades y deberes" permitidas por el Reglamento.[30] Es decir, la Junta de Directores y el cargo de agente administrador son creados por el mismo artículo de la Ley. De esa forma, el estatuto identifica al agente administrador como uno de los órganos internos de dirección del condominio y lo relaciona con el Presidente y, particularmente, con el Secretario de la Junta. A esta misma visión integral de dirección responde el que los deberes del agente administrador se definan como el ejercicio de aquellas facultades del Consejo de Titulares y la Junta de Directores que le sean delegadas, es decir, tareas que corresponderían realizar a uno de estos cuerpos.

El artículo 38 dispone, además, que el agente administrador será elegido por el voto afirmativo de la mayoría del Consejo de Titulares. Su nombramiento, al igual que el de los integrantes de la Junta de Directores, es de un año, pero dicho término puede prorrogarse tácitamente por períodos iguales, salvo que el reglamento del condominio disponga otra cosa.[31] Por último, la Ley dispone

---

[29] *Id.*

[30] 31 L.P.R.A. sec. 1293b(a)(2).

[31] *Id.*

que el Consejo de Titulares podrá remover al agente administrador de su puesto por acuerdo mayoritario tomado en reunión extraordinaria convocada al efecto,[32] mientras que la Junta de Directores podrá relevarlo de sus funciones por justa causa.[33]

Más allá de lo indicado, como nos explica el profesor Michel Godreau, "[s]obre este importante funcionario no es mucho lo que se dice en la Ley".[34] Tampoco habíamos tenido, hasta ahora, la oportunidad de analizar la figura del agente administrador y su relación con el condominio, particularmente con el Consejo de Titulares. Los peticionarios en los casos consolidados nos solicitan que concluyamos que ellos son empleados del condominio protegidos por las leyes del trabajo. Por su parte, los condominios recurridos nos invitan a identificar al agente administrador como un mandatario del condominio, excluido de las leyes laborales.

El consenso entre los tratadistas españoles es caracterizar la relación entre el agente administrador y el

---

[32] 31 L.P.R.A. sec. 1293b(b).

[33] 31 L.P.R.A. sec. 1293b-4(k). La Ley dispone que se entenderá por justa causa "el desempeño negligente o culposo de sus funciones, la deshonestidad o la violación de las normas de buena conducta establecidas en el Reglamento del condominio o el incumplimiento de sus deberes establecidos contractualmente". En dicho caso, la Junta tendría que convocar al Consejo de Titulares en un periodo de 30 días. *Id*.

[34] Michel Godreau, "El Condominio: El Régimen de Propiedad Horizontal en Puerto Rico", Ed. Diclan, San Juan, 1992, a la pág. 141. Si bien esta cita es en referencia a la antigua Ley de Propiedad Horizontal, lo mismo aplica a la Ley de Condominios de 2003.

condominio, como una relación <u>mandante-mandatario</u>,[35] con lo cual coincide la jurisprudencia de ese país.[36] En nuestra jurisdicción, Godreau y Hernández Denton opinan lo mismo.[37] Coincidimos con su conclusión. Vemos por qué.

Al abordar la cuestión, los tratadistas se concentran en los siguientes asuntos: la naturaleza de la gestión del agente administrador; la forma de su retribución; el deber de rendir cuentas; el rol del encargo; la dependencia y la representación en las labores del administrador. Sin embargo, cabe destacar que la posición de los tratadistas que conciben al administrador como mandatario no está ajena a la crítica. Esta se basa, principalmente, en la falta de correspondencia entre la figura conceptual del agente administrador y la relación que realmente se establece entre éste y el condominio. Según Rabella de Carrillo:

> Si en el terreno jurídico las funciones del Administrador en el estricto y justo sentido de la palabra, debían encajarse en el ámbito del mandato, quedando en consecuencia reguladas por los artículos 1.709 del Código Civil, <u>no es menos</u>

---

[35] José Puig Brutau, "Fundamentos de Derecho Civil", T. III, v. 2, 1979, a la pág. 129; Manuel Pons González y Miguel Ángel Del Arco Torres, "Régimen Jurídico de la Propiedad Horizontal", 6ta Ed., Ed. Comares, 1995, a la pág. 526; Manuel Batlle Vázquez, "La propiedad de casas por pisos", 8va Ed., Ed. Marfil, 1980, a la pág. 165.

[36] *Véase* Sentencia del Tribunal Supremo de España de 17 de diciembre de 1983. Véase, además, Sentencia de la Audiencia Territorial de Valencia de 28 de marzo de 1983 en F. Javier García Gil, "La Propiedad Horizontal y su Jurisprudencia", Ed. Aranzado, Zaragoza, 1988, a la pág. 432; Sentencia de la Audiencia Provincial de Madrid de 14 de noviembre de 1974 en *Id*, a la pág. 541.

[37] Godreau, *Op.Cit.*, a la pág. 144; Federico Hernández Denton, "La Ley de Propiedad Horizontal: un análisis de las enmiendas de 1976", 44 Rev. Col. Abogs. P.R. 257, 274 (1983).

cierto que en el terreno de la práctica se venían produciendo con frecuencia harto notable situaciones verdaderamente nebulosas en torno a la personalidad y facultades del Administrador.[38]

Uno de los principales temas discutidos por la doctrina en este contexto es el de la retribución de los servicios del agente administrador.[39] No podemos olvidar que el contrato de mandato se presume gratuito, presunción que difícilmente se extiende al cargo de administrador hoy día, máxime cuando por los conocimientos especializados y la inversión de tiempo considerable que se requiere del administrador, se tiende a buscar los servicios de un tercero ajeno a la comunidad. Sin duda, es un sinsentido que un tercero dedique largas horas de trabajo, de manera gratuita, al servicio de una comunidad a la que no pertenece. Esta realidad lleva a muchos a postular que el agente administrador no siempre es un mandatario. Por otra parte, la visión del administrador como un copropietario que sirve como tal gratuitamente es cónsona con la que sostiene que para que al administrador se le considere mandatario, es necesario que sus funciones se asemejen más a las de un miembro de la Junta de Directores que a las de

---

[38] (Énfasis suplido) José A. Rabella de Carrilo, "La Propiedad Horizontal", Eds. Acervo, Barcelona, 1960, a la pág. 135.

[39] "Por lo que se refiere a sus características, el extremo más interesante a tratar es, sin duda, el relativo a si se trata de un cargo retribuido o gratuito". M. Fernández Martín-Granizo, "Código de la Propiedad Horizontal", Ed. Revista de Derecho Privado, 1976, a la pág. 885.

un empleado, pues entre otras cosas, los directores no reciben retribución.

Ahora bien, la doctrina enfatiza en que, si bien la gratuidad es un elemento "natural" del mandato, tal característica no es "esencial",[40] aunque es un factor que debe considerarse para determinar si estamos ante un administrador o un empleado. Fernández Martín-Granizo concluye, respecto al asunto de la presunción de retribución, que ésta no depende de si se trata de un copropietario o de un tercero, sino de la <u>naturaleza del trabajo realizado y la persona que lo lleva a cabo</u>:

> Nosotros nos inclinamos por la retribución, tanto si es desempeñado por uno de los propietarios como por un extraño. En este último supuesto, porque es lógico que hayan de satisfacerse unos emolumentos, sueldo o como quiera llamársele a quien lo desempeña a cambio de sus servicios. En el de los propietarios, porque siendo el administrador quien tiene en realidad a cargo toda la gestión del edificio y su vigilancia, ha de dedicar al cumplimiento de estas funciones una atención y un tiempo que necesariamente debe sustraer a sus propias ocupaciones, sin olvidar que por ser el encargado de velar por el buen régimen del edificio, y como tal hacer las oportunas advertencias y apercibimiento a los propietarios de los pisos y locales, además de exigir una gran dedicación resulta un cargo incómodo.[41]

---

[40] Fernández Martín-Granizo, *Op.Cit.*, a la pág. 890; José Martín Blanco, "El contrato de trabajo: un estudio sobre su naturaleza jurídica", Ed. Revista de Derecho Privado, 1957, a las págs. 54-55.

[41] Fernández Martín-Granizo, *Op.Cit.*, a las págs. 885-886. A semejante conclusión llega Godreau: "Por lo general, el Agente Administrador desempeñará su cargo a cambio de una remuneración". Godreau, *Op.Cit.*, a la pág. 144.

Otro elemento utilizado por la doctrina para concluir que el agente administrador es un mandatario es su obligación de rendir cuentas al terminar sus funciones.[42] Igual ocurre con los elementos de encargo y de representación que pueden estar presentes en el puesto de administrador y que son cónsonos con el contrato de mandato. También se considera pertinente el que el escogido sea un copropietario o un tercero ajeno a la comunidad.[43] Fernández Martín-Granizo nos advierte que es este supuesto "el que plantea las mayores dificultades en orden a la determinación de la naturaleza jurídica de la figura del administrador de la propiedad horizontal".[44] La razón es que, al ser una persona ajena a la comunidad, su contratación puede configurarse más fácilmente y a la medida de las necesidades del condominio, como mandato, arrendamiento de servicios o contrato de trabajo.

Fernández Martín-Granizo identifica tres relaciones posibles entre el tercero y el condominio. Estas son: que el tercero labore, "con carácter de continuidad, en una oficina sita en el propio edificio y con remuneración fija,

---

[42] Rabella de Carrillo, *Op.Cit.*, a las págs. 138, 141; Sentencia del 3 de julio de 1980 de la Audiencia Territorial de Zaragoza en García Gil, *Op.Cit.*, a la pág. 551.

[43] Fernández Martín-Granizo, *Op.Cit.*, a la pág. 887.

[44] (Énfasis suplido) *Id*, a la pág. 889. Fernández Martín-Granizo identifica a Batlle como el principal propulsor del administrador como mandatario, a Visco como proponente de caracterizarlo como laboral o mixto y a Salis y Rizi como defensores de la idea de hacer la determinación entre contrato laboral o de mandato según la naturaleza de la actividad realizada. *Id*, notas 29-31.

y se dedique única y exclusivamente a desempeñar las funciones propias de dicho cargo";[45] que el tercero, "teniendo otras ocupaciones propias, dedique su tiempo sobrante a llevar la administración de uno o varios edificios en su propio domicilio, mediante remuneración fija";[46] o que se trate "de una entidad especializada en la realización de estos servicios, con empleados fijos y mediante remuneración".[47]

En el tercer supuesto, el agente administrador sería la persona jurídica contratada, en cuyo caso estaríamos claramente ante un contrato de mandato. En cuanto al primer y segundo supuestos, la diferencia entre éstos sería la "habitualidad o profesionalidad del administrador".[48] En el primer supuesto, "se pued[e] decir que, al menos en ciertos aspectos, el administrador va a tener la cualidad de empleado de la junta de propietarios […] Ello ha dado lugar a que, por algunos tratadistas, se considere que en el primer caso nos hallamos a presencia de una relación de tipo laboral y que, por consiguiente, la revocación del cargo ha de ir precedida del preaviso o acompañada de la procedente indemnización".[49]    Fernández Martín-Granizo

---

[45] *Id.*

[46] *Id*, a la pág. 891.

[47] *Id.*

[48] Fernández Martín-Granizo, *Op.Cit.,* a la pág. 891.

[49] *Id.* Según Fernández Martín-Granizo, "no podemos negar que en este concreto supuesto concurren varios de los requisitos que caracterizan las relaciones de trabajo […] tales como la dependencia o subordinación y la remuneración, sin olvidar la habitualidad o profesionalidad

concluye entonces que en este primer supuesto, el agente administrador es un mandatario simple.[50]

Finalmente, sobre el segundo supuesto, Fernández Martín-Granizo propone que "aun cuando en principio parece que tien[e] más de arrendamiento de servicios que de mandato, por las mismas consideraciones que hemos hecho para el [primer supuesto], estimamos que se tratará también de un mandato, sin negar totalmente la posibilidad de que pudiera ser configurado como una figura mixta de mandato simple y arrendamiento de servicios".[51]

Estas conclusiones de Fernández Martín-Granizo no son aceptadas unánimemente por los tratadistas. En vez, Pons González y Del Arco Torres insisten en que la figura del agente administrador no responde a una caracterización absoluta, y que todo dependerá de las circunstancias particulares de su relación con el condominio. Para ellos, será fundamental la naturaleza de las tareas que se le asignen al administrador y si se trata de un trabajo que normalmente haría un copropietario como parte del Consejo de Titulares o de la comunidad en general. En esa dirección, citan con aprobación la Sentencia de la Audiencia Territorial de Valencia de 25 de mayo de 1988,

---

que en opinión de algunos autores es importante en las relaciones laborales". *Id*. No obstante, el tratadista también reconoce que muchos de estos factores también son compatibles con el contrato de mandato, lo que reafirma la dificultad de distinguir entre ambas figuras.

[50] Fernández Martín-Granizo, *Op.Cit.*, a la pág. 893.

[51] *Id*, a la pág. 894.

que tras reconocer que se trata de una "[c]uestión ampliamente debatida", expone:[52]

> [S]ólo pueden ser objeto posibles de mandato aquellos actos en que quepa la sustitución, o sea, los que el mandante realizaría normalmente por sí mismo, que pertenecen a la esfera propia de su misma actividad […] [C]uando se encomienda a otra persona la prestación de servicios que normalmente no pueden ser realizados ni son de la propia actividad de la persona que los encomienda a otro, que precisamente necesita acudir a él para que lleve a cabo la actividad que aquél no podía utilizar […] es conducente a situación de arrendamiento de servicios.[53]

De lo anterior podemos concluir, primeramente, que la relación entre la persona escogida y la comunidad de residentes es pertinente a la caracterización de la relación contractual entre el administrador y el condominio. Si la persona contratada es un tercero ajeno a la comunidad, ya sea una compañía dedicada a ofrecer servicios de administración o una persona natural que se dedica a ofrecer dichos servicios a más de un condominio,

---

[52] Para ello citan la Sentencia de la Audiencia Provincial de Valencia del 4 de junio de 1993 en la que dicho tribunal expresa que: "Tanto el vínculo existente entre la comunidad de propietarios y administrador de la misma […] como el vínculo existente entre dicha comunidad y [el Administrador] no conviene el título de mandato que le atribuye la sentencia recurrida sino el de arrendamiento de servicios que reiteradísima doctrina asigna a los contratos que se celebran entre todo profesional liberal y su cliente". (Énfasis suplido) Pons González y Del Arco Torres, *Op.Cit.*, a la pág. 529, n. 9.

[53] *Id*, a las págs. 534-535. De igual forma, el tribunal hace hincapié en que "[n]o cabe olvidar tampoco la creciente profesionalización de estas actividades de administración, paralela a la igualmente creciente complejidad de la vida socioeconómica y de los trámites burocráticos a seguir para adecuarse a la desbordante intervención administrativa en cualquier tipo de actividad económica…". *Id*, a la pág. 535.

estaremos ante un mandatario y la relación será gobernada por la figura del contrato de mandato o, si las partes así lo han convenido, por un contrato mixto. Igual conclusión se requiere en el supuesto del tercero que dedica su tiempo exclusivamente a la administración de un condominio.

En vista de lo anterior, resolvemos que cuando se trate de un "agente administrador" en el régimen de propiedad horizontal, éste será considerado un mandatario sujeto a las disposiciones pertinentes del Código Civil, según atemperadas por la Ley de Condominios.

III.

Aunque la mayoría de la doctrina se inclina hacia caracterizar al "agente administrador" como mandatario – conclusión que adoptamos en esta Opinión- subsiste una gran confusión sobre cómo diferenciar la figura del agente administrador de la de un empleado cobijado por un contrato de trabajo o de arrendamiento de servicios. Cuando analizamos la doctrina aplicable al contrato de mandato el panorama se complica aún más, pues, independientemente del caso del administrador de condominio, hay una gran confusión entre la figura del mandatario y la del empleado cobijado por la legislación laboral.

Habiendo resuelto que un "agente administrador" es un mandatario del Consejo de Titulares, aún nos hace falta determinar <u>quién</u> es un "agente administrador" para efectos de la Ley de Condominios. Esto, pues cabe la posibilidad de que en algunos casos la persona contratada nominalmente como "administrador" no tenga las facultades de ese puesto,

sino que lleve a cabo tareas ajenas a dicho cargo. Dado que en nuestro ordenamiento el título no hace la cosa, no basta la denominación hecha por las partes o que a la persona contratada se le otorgue ese título, sin más. El "agente administrador", como figura jurídica, tiene unas características que lo distinguen y que una persona debe tener para considerarse como tal.

Para poder estudiar adecuadamente la figura del agente administrador, hace falta recurrir a la normativa española y la doctrina científica de ese país, de donde la adoptamos. La primera disposición de ley que hace mención del administrador de fincas urbanas en España es el artículo 18 de la Ley de 21 de julio de 1960.[54] Explica el tratadista Rabella de Carillo que la disposición "configura, por vez primera en el derecho español, la figura del Administrador de Fincas -bien que para el caso concreto de la propiedad horizontal- con notable detalle, tanto en lo que a su nombramiento, cese, condición, etc., respecta, como en lo relativo a sus funciones y facultades".[55] Reconoce, además, que se trata de una

---

[54] Ley de 21 de julio de 1960, núm. 49/60, Jefatura del Estado, B.O. 23, Reps. Legs. 1042.

[55] Rabella de Carrillo, *Op.Cit.,* a la pág. 119. Rabella de Carrillo menciona que hubo una referencia pasajera a esta figura en la Ley de Viviendas Protegidas de 1939. *Id*, a la pág. 136. Según Ventura-Traveset y González "[el]l único antecedente legal en que [aparece] la figura del administrador de comunidad, es el artículo 398 del Código Civil, según el cual, como para la administración y mejor disfrute de la cosa común son obligatorios los acuerdos de la mayoría de los partícipes, sino resultare mayoría o el acuerdo de ésta fuere gravemente perjudicial a los interesados en la cosa común, el Juez proveerá, a instancia

"denominación tan amplia como vaga" por lo cual "viene a englobar a todas aquellas personas que, por encargo del propietario de un inmueble, tienen a su cargo tanto las relaciones del mismo con el Fisco (pago de contribuciones, arbitrios, inspecciones, etc.), como el cuidado de su explotación (contratación, cobro de alquileres, revisando precios, etc.), y la conservación material de las cosas (obras de reparación, suministros, etc.)".[56] Esta cita revela la dificultad de definir con precisión la naturaleza jurídica del cargo de administrador de fincas. Sumado a esto, las cada vez más complicadas relaciones sociales de la vida moderna han exigido cambios conceptuales que apartan al administrador de un inmueble sometido a propiedad horizontal del administrador de fincas original. Esto es importante, pues muchos de los tratadistas que citaremos estudian la figura del agente administrador como si fuera el administrador de fincas de aquel mundo que hoy no existe.

Originalmente, cuando la administración de un edificio no conllevaba el empleo de mucho tiempo o esfuerzo ni de conocimientos especializados, se escogía de entre la comunidad a un titular, al igual que se escogía al presidente o al tesorero, para que se ocupase de los

---

de parte, lo que corresponda, <u>incluso nombrará un administrador</u>". (Énfasis en original) Antonio Ventura-Traveset y González, "Derecho de propiedad horizontal", Ed. Bosch, Barcelona, 1980, a la pág. 385.

[56] (Énfasis suplido) Rabella de Carrillo, *Op.Cit*, a la pág. 135.

asuntos internos del condominio. Incluso, el recurrir a un tercero extraño a la comunidad no era la norma y los tratadistas tuvieron que aclarar que esa opción no era incompatible con el régimen de propiedad horizontal.[57] Poco a poco, la doctrina comenzó a reconocer la tendencia a favor de la profesionalización de la figura del agente administrador mediante la selección de una persona ajena a la comunidad.[58]

En efecto, la figura del agente administrador surge porque las complejidades de la vida moderna no permitían a la comunidad organizada como Consejo de Titulares, ni a ninguno de los propietarios individualmente, encargarse a tiempo completo de todos los asuntos relacionados al condominio.[59] Como explica Batlle Vázquez, "[t]oda organización colectiva necesita, para su eficacia, de un agente ejecutivo, de un gestor que mantenga la administración de ritmo necesario, por lo que es indispensable la existencia de un administrador".[60] Es

---

[57] *Véase* Rabella de Carrillo, *Op.Cit.*, a la pág. 120. Por su parte, Puig Brutau expresa que ya "no es necesario que pertenezca a la comunidad de propietarios". Puig Brutau, T. III, *Op.Cit.*, a la pág. 129.

[58] Rabella de Carrillo, *Op.Cit.,* a la pág. 137. Esta visión no es unánime. Según Ventura-Traveset y González, "la experiencia demuestra que la administración está mejor en manos de uno de los copropietarios que en manos de un ajeno a la comunidad". Ventura-Traveset y González, *Op.Cit.*, a la pág. 385, n. 2. Claro está, esto no es incompatible con la visión de que el administrador deba ser una persona con conocimientos especializados y que dedique una cantidad sustancial de su tiempo al desempeño de ese cargo. Véase, además, Hernández Denton, *supra*, a la pág. 272.

[59] Pons González y Del Arco Torres, *Op.Cit.*, a la pág. 526.

[60] Batlle Vázquez, *Op*.Cit., a la pág. 164.

decir, más que una conveniencia para la comunidad, el agente administrador se ha convertido en una necesidad, particularmente para los complejos que incluyen una cantidad considerable de apartamentos. Según este tratadista:

> En las pequeñas comunidades se suele nombrar administrador a uno de los propietarios, pero en las de mayor importancia se requieren especiales condiciones y conocimientos que no siempre se encuentran entre los dueños interesados, por lo que es práctica frecuente acudir a personas competentes extrañas a la comunidad, a las que se remunera a cargo de ésta.[61]

Nuestra Ley de Condominios visualiza al administrador como parte de la dirección de la comunidad y reconoce, en su artículo 38, que entre la Junta de Directores, el Presidente, el Secretario, el Tesorero y el agente administrador, hay una relación particular. Esto es producto del entendimiento de que estos cargos, particularmente los del Presidente y el de agente administrador, son los principales órganos de gestión interna de un condominio.[62] En efecto, la doctrina vincula,

---

[61] *Id.*

[62] *Véase* Pons González y Del Arco Torres, *Op.Cit.*, a la pág. 525: "En unión del Presidente, son los únicos órganos ejecutivos de la propiedad horizontal". Véase, además, Sentencia de 28 de marzo de 1985 de la Audiencia Territorial de Valencia en García Gil, *Op.Cit.*, a la pág. 432; Fernández Martín-Granizo, *Op.Cit.*, a las págs. 868, 885; Gordeau, *Op.Cit.*, a la pág. 142. Por su parte, Hernández Denton, al sostener que el agente administrador según definido en la Ley de Condominios no puede tener una relación laboral con el condominio, propone lo mismo en cuanto al Presidente, el Secretario y los demás integrantes de la Junta de Directores. Es decir, Hernández Denton enfatiza en que el administrador está en una posición

constantemente, la figura del administrador con la del Presidente[63] y, más todavía, con la del Secretario.[64] La visión original era que ambos cargos, el de administrador y el de Presidente, podían ser, y en muchas ocasiones eran, ocupados por la misma persona. Incluso, para Puig Brutau, la Ley de 21 de julio 1960 antes mencionada requería que se estableciera expresamente en el Reglamento del condominio que el Presidente no sería el administrador, pues, en ausencia de tal disposición, la misma persona podría ocupar ambos puestos.[65]

La doctrina también asocia, incluso con más fuerza, al administrador con la figura del Secretario. Lo que es más, muchos tratadistas hacen referencia, más que al agente administrador, al "Secretario-Administrador".[66] Incluso,

---

semejante a los demás directores. Federico Hernández Denton, "La Ley de Propiedad Horizontal: un análisis de las enmiendas de 1976", *supra,* a la pág. 274. Ahora bien, lo que nos corresponde atender es si esta restricción contra los directores aplica igualmente a casos en los que la persona contratada ostenta el título de administrador mas no se desempeña como tal.

[63] Pons González y Del Arco Torres, *Op.Cit.*, a la pág. 528. Eso explica la postura de Rabella de Carrillo al éste afirmar que el nombramiento de un agente administrador no es obligatorio, pues puede recaer sobre el Presidente. Rabella de Carrillo, *Op.Cit.*, a la pág. 137. Véase, además, Batlle Vázquez, *Op.Cit.*, a la pág. 164.

[64] *Véase* Pons González y Del Arco Torres, *Op.Cit.*, a la pág. 527. De la descripción de las funciones del agente administrador que hacen estos tratadistas surge la similitud entre el Secretario y el agente administrador, por ejemplo, encargarse de las actas, citar a las reuniones, notificar los acuerdos, entre otros.

[65] Puig Brutau, T. III, v. 2, *Op.Cit.*, a la pág. 128.

[66] *Véase Id*; Pons González y Del Arco Torres, *Op.Cit.*; Fernández Martín-Granizo, *Op.Cit.*, a las págs. 313-314.

Pons González y Del Arco Torres proponen que la relación entre el Secretario y el Administrador es lo suficientemente estrecha como para afirmar que este último podría "[a]ctuar, en su caso, como Secretario de la Junta".[67] Otro tratadista, Ventura-Traveset y González afirma que las primeras normas relativas al agente administrador lo conciben como un *alter-ego* del Presidente o, en su defecto, del Secretario: "Hay que advertir que estas funciones corresponden al administrador, tanto en el caso de que el presidente actúe como administrador […] o cuando el secretario sea al propio tiempo administrador".[68]

Si bien el desarrollo ha sido hacia cierta separación entre la figura del agente administrador y los demás integrantes de la Junta de Directores, con el fin de permitir que un extraño a la comunidad pueda ejercer el cargo, no podemos perder de perspectiva que el 'administrador' al que parte de la doctrina hace referencia se asemeja más al Secretario de la Junta que a un ente externo contratado para llevar a cabo cualquier labor en beneficio del edificio. Hasta el día de hoy, el agente administrador contemplado por los tratadistas tiene como referente histórico y normativo al Secretario-Administrador. En la medida que las funciones de la persona escogida se asemejen a las funciones típicas del administrador, ya sea en cuanto a los poderes que se le

---

[67] Pons González y Del Arco Torres, *Op.Cit.*, a la pág. 528.

deleguen o en las labores que realice, la normativa sobre el agente administrador en la propiedad horizontal aplicará en todos sus aspectos. Así, más que el título dado por las partes, se deben auscultar las funciones y poderes atribuidos al administrador caso a caso, de manera que las disposiciones del artículo 38 de la Ley de Condominios cubran solamente aquellas situaciones en las que se trate de un "agente administrador". De esta forma, resulta necesario distinguir entre el "agente administrador", cuyas funciones corresponden a los deberes y facultades reconocidos como inherentes al cargo por la Ley,[69] y una persona contratada para atender otros asuntos del condominio excluido de la definición provista por el artículo 38.

La propia doctrina reconoce la gran dificultad de distinguir entre el "agente administrador" y el empleado sujeto a un contrato de trabajo o de arrendamiento de servicios, quien realiza otras funciones ajenas al cargo de "agente administrador" Incluso, la doctrina también

---

[68] Ventura-Traveset y González, *Op.Cit.*, a la pág. 387; Véase, además, Fernández Martín-Granizo, *Op.Cit.*, a la pág. 885.

[69] *Véase* Sentencia del Tribunal Supremo de España de 10 de febrero de 1947, Repertorio Aranzadi 202. En dicho caso, el máximo foro español determinó que una administradora de finca rústica era una empleada cobijada por la legislación laboral y no una mandataria, debido a la falta de libertad de actuación y otras circunstancias de la relación entre las partes que la excluían de esta figura contractual. Cuando, por el contrario, la realidad de la relación apunta a facultades amplias de administración y representación, el tribunal español ha excluido a la persona de las leyes laborales y ha aplicado la normativa del contrato de mandato. Sentencia del 7 de junio de 1940, Repertorio Aranzadi 547.

reconoce los argumentos que pueden llevar a concluir que, en determinadas circunstancias, una persona contratada para atender otros asuntos internos del condominio no es un mandatario, sino un empleado. También es importante recordar que aun si este análisis nos lleva a concluir que las funciones desempeñadas o las delegadas corresponden a las de un mandatario, nada impide que las partes pacten un contrato mixto de mandato y arrendamiento de servicios en el que se otorguen ciertos beneficios de tipo 'laboral' al administrador.[70]

Las funciones del agente administrador son muy amplias, al igual que el "margen de confianza en su actuación".[71] En términos generales, las funciones reconocidas al agente administrador español son de tres tipos: ejecutivas, de propia iniciativa y de custodio contable.[72] Principalmente, sus responsabilidades son de coordinación y supervisión[73] lo cual incluye la potestad de contratar en su condición de mandatario, tanto al personal del condominio como a suplidores de servicios y

---

[70] Es decir, nada impide que las partes, fundamentándose en el principio de la libertad de contratación y la autonomía de la voluntad, pacten como parte del contrato que el administrador recibirá beneficios tales como bono de navidad, vacaciones, licencia por enfermedad, entre otros.

[71] Rabella de Carrillo, *Op.Cit.*, a la pág. 119. Véase, además, Ventura-Traveset y González, *Op.Cit.*, a la pág. 396.

[72] Batlle Vázquez, *Op.Cit.*, a la pág. 166.

[73] Rabella de Carrillo, *Op.Cit.*, a la pág. 141.

materiales.[74] Esta potestad, a su vez, parte de la premisa de que las facultades del agente administrador son potestades del Consejo de Titulares o la Junta de Directores que le fueron delegadas.[75]

Como sugiere Fuentes Lojo, el administrador es "como gerente de la comunidad", y se le deben adscribir las facultades inherentes a todo gerente.[76] Igual propone Ventura-Traveset y González al reconocer la analogía entre las funciones del administrador y las del "gerente de un negocio" y "el naviero de un buque perteneciente a varias personas".[77] Por tanto, una persona será "agente administrador" si por virtud de su contrato se le delegan facultades o responsabilidades que corresponden, en primera instancia, al Consejo de Titulares o la Junta de Directores. Además, se analizará cuáles son las funciones que ejerce en la realidad.

Nuestra Ley de Condominios calla sobre las funciones del agente administrador, pero establece claramente que el Consejo de Titulares lo removerá "por acuerdo mayoritario tomado en reunión extraordinaria convocada al efecto".[78] El

---

[74] *Id*, a las págs. 153-155.

[75] Fernández Martín-Granizo, *Op.Cit.*, a la pág. 887; Godreau, *Op.Cit.*, a la pág. 141.

[76] J.V. Fuentes Lojo, "Suma de la Propiedad por Apartamentos", Bosch, 1985, a la pág. 358.

[77] Ventura-Traveset y Gonzáles, *Op.Cit*, a la pág. 385, citando a Jerónimo González.

[78] 31 L.P.R.A. sec. 1293b(b). Por su parte, la Junta de Directores podría remover al agente administrador por justa causa, definida en el propio artículo 38 de la Ley de Condominios, decisión que tendría que ser confirmada

Consejo de Titulares también puede prescindir del agente administrador negándose a renovar el contrato anual. Esta facultad para remover libremente al agente administrador es uno de los elementos que según la doctrina sirven para demostrar que el administrador es, en efecto, un mandatario, pues a éste también se le puede revocar su mandato de manera unilateral y sin necesidad de justificación.[79]

La exigencia de justa causa para la remoción del agente administrador únicamente aplica a la Junta de Directores, no al Consejo de Titulares, cuyo poder de remoción es absoluto y unilateral, aunque el Reglamento del condominio puede limitar esta autoridad. Por tanto, en Puerto Rico, cuando se remueve a un "agente administrador", no habrá indemnización más allá del rembolso que le corresponde, como mandatario, por los gastos incurridos. Ahora bien, si el contrato entre el condominio y el administrador-mandatario incluye beneficios como vacaciones, bono de navidad y otros, y éstos han sido

_____

eventualmente por el Consejo de Titulares. Véase nota núm. 33.

[79] El mandato puede extinguirse por su revocación o la renuncia del mandatario, así como por la muerte, quiebra o insolvencia del mandante o del mandatario. Artículo 1623 del Código Civil; 32 L.P.R.A. sec. 4481. Resulta anómalo que si el agente administrador es, en efecto, un mandatario, su contrato terminaría por el mero hecho de su insolvencia o quiebra. Como puede notarse, no siempre aplican nítidamente los elementos del contrato de mandato a la figura del administrador en la propiedad horizontal. Por otra parte, Puig Brutau añade otra causal de terminación: el transcurso del tiempo por el que se constituyó el mandato. José Puig Brutau, "Fundamentos de Derecho Civil", T. II, v. 2, Ed. Bosch, 1982, a la pág. 419.

acumulados o son debidos, el condominio deberá efectuar dichos pagos. La doctrina de *pacta sunt servanda* así lo exige. Incluso, como explica Batlle Vázquez, pueden existir "cláusulas de permanencia mayor en el cargo que, sin mengua de la posible remoción por parte de la asamblea, obligue a indemnizar los despidos injustos o anticipados al plazo convenido".[80] Por consiguiente, el "agente administrador" que es despedido antes del término estipulado en su contrato no tendrá derecho a compensación por los salarios dejados de percibir, pero sí a los salarios por trabajo ya realizado y cualesquiera otros beneficios debidos bajo la relación contractual particular, salvo que el contrato disponga otra cosa.[81]

IV.

Al igual que ocurre con la definición de "agente administrador" en la Ley de Condominios, el Código Civil no ofrece la claridad necesaria para distinguir con precisión entre el contrato de mandato y otras figuras contractuales similares, como el contrato de trabajo, el de arrendamiento de servicios y el de ejecución de obra.[82] En todos éstos,

---

[80] Batlle Vázquez, *Op.Cit.*, a la pág. 164.

[81] Fernández Martín-Granizo, *Op.Cit.*, a las págs. 905-906.

[82] Mediante un contrato de mandato "se obliga una persona a prestar algún servicio o hacer alguna cosa, por cuenta o encargo de otra". Artículo 1600 del Código Civil; 32 L.P.R.A. sec. 4421. Éste puede ser general o especial; el primero comprende todos los negocios del mandante; el segundo, uno o más negocios determinados. Artículo 1603 del Código Civil; 32 L.P.R.A. sec. 4424. De igual forma, el contrato de mandato puede ser concebido en términos generales, entendiéndose tan sólo para asuntos de administración, o puede ser expreso, con lo cual se permite

una persona ofrece servicios a otra y, como ilustra Díez-Picazo, se han realizado "múltiples esfuerzos doctrinales […] a fin de buscar un criterio de diferenciación con el contrato de servicios o de obra".[83]

Según el tratadista Martín Blanco, el asunto se complica cuando se pretende diferenciar el contrato de mandato del contrato de trabajo: "El esfuerzo de la doctrina por encasillar el contrato de trabajo dentro del cuadro general de las figuras contractuales, ha llevado a un sector de aqu[é]lla a intentar catalogar y clasificar la figura del contrato laboral sobre el plano o molde del contrato de mandato".[84] Claro está, no podemos perder de

---

al mandatario realizar actos dispositivos, dentro del marco contractual establecido. Artículo 1604 del Código Civil; 32 L.P.R.A. sec. 4425.

[83] Díez-Picazo, *Op.Cit.*, a la pág. 351. Por su parte, en su obra, Puig Brutau discute la figura del mandato en un acápite titulado "Mandato, Prestación de Servicios y Ejecución de Obra". Puig Brutau, T. II, v. 2, *Op.Cit.*, a la pág. 395.

[84] José Martín Blanco, "El contrato de trabajo: estudio sobre su naturaleza jurídica", Ed. Revista de Derecho Privado, 1957, a la pág. 46. Entre las obligaciones que tiene el mandatario se encuentran las siguientes: ejecutar el encargo con arreglo a las instrucciones del mandante; no traspasar los límites del mandato; dar cuenta de sus operaciones y abonar al mandante cuanto haya recibido en virtud del mandato; pagar intereses por las cantidades que ha aplicado a usos propios; ser responsable por la gestión del sustituto, pues a menos que se lo haya prohibido el mandante, el mandatario puede designar un sustituto y responder por los efectos de dolo o culpa suya. Luis Díez-Picazo y Antonio Gullón, "Sistema de Derecho Civil", v. II, Ed. Tecnos, 1976, a las págs. 354-356. Esta facultad del mandatario es curiosa, pues nadie propone que el agente administrador, como mandatario, puede designar a un tercero para que le sustituya como administrador. Nuevamente, se hace evidente que no hay correspondencia absoluta entre el agente administrador y el mandatario.

perspectiva que esta dificultad es producto de una época en la que el derecho del trabajo estaba aún incipiente y no había alcanzado el nivel de complejidad y desarrollo que goza hoy en día. Para este tratadista, la principal diferencia entre el contrato de mandato y el de trabajo se hace en torno a dos elementos o criterios: precio y representación.[85]

En cuanto al primer elemento, el tratadista revive la polémica de la retribución en el mandato. Esta posibilidad, que como dijimos se puede dar mediante pacto expreso o cuando el mandatario tenga por ocupación llevar a cabo la gestión encomendada, establece una clara diferencia entre el contrato de mandato y el contrato de trabajo, pues no existe, por definición, un contrato de trabajo gratuito. Martín Blanco concluye, por tanto, que siempre que opere la gratuidad, estaremos ante una relación mandante-mandatario. Por el contrario, si hay retribución habrá que precisar de otro modo si se trata de un contrato de mandato retribuido o un contrato de trabajo.

El segundo elemento discutido por Martín Blanco, y el más importante, es la representación. Ésta, a su vez, guarda relación con otros: la subordinación, el objeto de la relación y la confianza. Sobre la subordinación o dependencia, el tratadista explica que: "La relación de subordinación que la jurisprudencia estima como característica del contrato de trabajo no existe, sin duda

---

[85] *Id*, a la pág. 47.

alguna, en el mismo grado en las relaciones entre mandatario y mandante, pero no es completamente extraña a esas relaciones. El mandatario actúa por órdenes y a veces bajo la dirección del mandante. Hay una diferencia de grado en la subordinación, pero es imposible limitarse a esa única diferencia para distinguir los dos contratos".[86]

Por su parte, Díez-Picazo advierte que no debe hacerse demasiado énfasis en el asunto de la representación, pues "[m]andato y representación son instituciones distintas".[87] Según Castán Tobeñas, la representación es un elemento ordinario pero no esencial del contrato de mandato.[88] Para Puig Brutau, sin embargo, el asunto de la subordinación o dependencia y la representación son, en extremo, pertinentes a la calificación del contrato:

> Por el contrato de mandato alguien actúa por cuenta de otro frente a terceros con independencia de lo que haga en nombre propio o en el de su mandante, y de que lo haga de manera gratuita o a cambio de una remuneración.
> Por el contrato de prestación de servicios queda establecida entre dos personas una relación de dependencia, transitoria o duradera, que permite a una de ellas obtener servicios y a la otra cobrar una remuneración.
> Por el contrato de ejecución de obra una de las partes queda obligada a proporcionar a la otra un resultado determinado con su trabajo independiente, a cambio de un precio convenido.[89]

---

[86] *Id*, a la pág. 50.

[87] Díez-Picazo, *Op.Cit.*, a la pág. 352. Por su parte, Castán Tobeñas advierte contra confundir el mandato y el poder. Castán Tobeñas, *Op.Cit.*, a las págs. 531-532.

[88] José Castán Tobeñas, "Derecho civil español, común y foral", Revs, S.A., Madrid, 1985, a las págs. 531-532.

[89] (Énfasis suprimido) Puig Brutau, T. III, v. 2, *Op.Cit.*, a la pág. 395. Véase, además, Castán Tobeñas, *Op.Cit.*, a la pág. 529.

Es decir, el elemento que diferencia el contrato de mandato de los demás es la naturaleza de la prestación.[90] Como sugiere Martín Blanco, "[e]l mandato es esencialmente un contrato de representación, destinado a permitir a una persona realizar un acto jurídico o una serie de actos por cuenta de otra, mientras que el contrato de trabajo tiene por objeto la realización de un trabajo con independencia de toda idea de representación".[91] Esta serie de actos se refiere a <u>actos o resultados jurídicos</u>, es decir, "la creación directa de un derecho en favor del mandante por mediación del mandatario", mientras que el trabajo realizado es accesorio al resultado jurídico generado.[92]

De igual manera, Puig Brutau advierte del peligro de no darle sentido práctico a esta aseveración, pues podría confundir y llevar a resultados absurdos:

> Pero no tendría sentido decir que el contratista que ha recibido el encargo (tanto si es directamente del interesado como de un mandatario suyo) gestiona intereses ajenos a la obra. Si esto fuera admisible, podría igualmente decirse que <u>el vendedor que entrega al comprador</u>

---

[90] Puig Brutau, T. III, v. 2, *Op.Cit.*, a la pág. 402; Castán Tobeñas, *Op.Cit*, a la pág. 536.

[91] Martín Blanco, *Op.Cit.*, a la pág. 50.

[92] *Id.*, a las págs. 50-51. A igual conclusión llega Díez-Picazo: "Entendemos que la esencia de la actividad del mandatario se halla en la conclusión de actos o negocios jurídicos; en otras palabras, en una actividad jurídicamente relevante". Díez-Picazo, *Op.Cit.*, a la pág. 351. Véase, además, Puig Brutau, T. II, v. 2, *Op.Cit.*, a la pág. 396; Castán Tobeñas, *Op.Cit.*, a la pág. 537.

<u>la cosa vendida gestiona intereses de éste, lo
cual no tendría sentido.</u>[93]

El tema del encargo y la representación, así como la
naturaleza de la prestación, tiene una relación estrecha
con el <u>propósito</u> del mandato: el mandante delega en el
mandatario <u>aquello que el propio mandante pudo haber hecho
por cuenta propia</u>. A medida que lo realizado por la persona
contratada sea algo que el principal no pudo haber hecho
por cuenta propia, razón por la cual recurrió a un tercero
presumiblemente diestro en la tarea solicitada, nos
habremos alejado del contrato de mandato. En sentido
contrario, si se trata de una labor que el principal pudo
haber hecho por sí mismo, estaremos ante una relación
mandante-mandatario.[94]

Por último, el asunto de la <u>confianza</u> es uno de los
elementos más enfatizados para diferenciar el contrato de
mandato de las demás figuras contractuales que hemos
identificado.[95] Por eso es que se hace referencia a la
relación de "cooperación", "fiducia", "desinterés" y
"amistad".[96]

---

[93] (Énfasis suplido) Puig Brutau, T. II, v. 2, *Op.Cit.*, a la
pág. 402. Incluso, Puig Brutau se refiere a la figura
angloamericana del *agency* y el *vertretung* alemán. A
semejante conclusión llega Castán Tobeñas, pues si se
permite una definición demasiado amplia del encargo y la
obra en beneficio de intereses ajenos, "todo gestor de
negocios ajenos" sería un mandatario. Castán Tobeñas,
*Op.Cit.*, a la pág. 538.

[94] Castán Tobeñas, *Op.Cit.*, a la pág. 537.

[95] Puig Brutau, T. II, *Op.Cit.*, a la pág. 419.
[96] Castán Tobeñas, *Op.Cit.*, a la pág. 530, n. 1, a las págs.
534-536.

V.

Pasamos entonces a analizar los dos casos ante nuestra consideración. En el caso CC-2010-616, la señora Candelario supervisaba a ocho (8) empleados del condominio, así como a los diferentes contratistas que le prestaban servicios al mismo; su horario de trabajo era de 8:00am a 5:00pm, aunque pasaba la mayoría del tiempo fuera de la oficina, supervisando el complejo; estaba autorizada a contratar a nombre del condominio y tenía potestad para emplear y despedir a los trabajadores; preservaba los récords; y llevaba a cabo aquellas labores que la Junta de Directores o el Consejo de Titulares le delegaba. Ante este cuadro, no hay duda de que la señora Candelario era una "agente administradora" según establecido por el artículo 38 de la Ley de Condominios. Si bien llama la atención que se descontaran de su sueldo las cantidades correspondientes a seguro social, contribuciones y pagos por seguro de desempleo, ello no derrota la conclusión de que sus funciones correspondían a las de agente administradora y que era, por ende, mandataria del condominio y no empleada de éste. Por tanto, no tiene derecho al pago de mesada.

No obstante, la relación entre la señora Candelario y el condominio incluía beneficios como licencia de enfermedad, vacaciones y bono de navidad y ella es acreedora al pago por estos conceptos que son parte válida del contrato entre las partes. Por tratarse de una deuda contractual debidamente incurrida por el condominio, no aplica la disposición de la Ley de Condominios que fija el

límite máximo de lo que la Junta puede desembolsar, para transar reclamaciones, sin la autorización del Consejo de Titulares. Además, la suma de las partidas de vacaciones, enfermedad y bono de navidad no llegan al tope de $5,000 fijado por la ley.

En el caso CC-2010-277, la relación entre el señor Colón Ortiz y el condominio es menos clara. El peticionario tenía un horario fijo de trabajo; no tenía autoridad para emplear o despedir; no tenía discreción alguna en el desempeño de sus labores; no supervisaba empleado alguno; al momento de su accidente estaba trabajando físicamente con el contenedor de basura y recibió los beneficios del Fondo del Seguro del Estado como si se tratase de un empleado. No obstante, el foro primario no hizo determinaciones de hechos sobre cuáles eran las labores que llevaba a cabo el señor Colón Ortiz. De igual forma, el contrato de administración suscrito entre las partes incluye una lista extensa de deberes y facultades semejantes a las que desempeña un "agente administrador".[97] Ante ese panorama, tenemos que concluir que el peticionario era un "agente administrador" para efectos del artículo 38 de la Ley de Condominios y, por tanto, un mandatario del Consejo de Titulares excluido de las leyes protectoras del trabajo.

En virtud de lo anterior, modificamos la sentencia dictada por el Tribunal de Apelaciones en el caso CC-2010-

---

[97] Véase nota al cale núm. 3.

616 a los efectos de que procede la acción en cobro de dinero por la cantidad pagada en concepto de la mesada, mas no las sumas pagadas por concepto de vacaciones, enfermedad y bono de navidad. Además, confirmamos la decisión del Tribunal de Apelaciones en el caso CC-2010-277.

Se dictará Sentencia de conformidad.


                                        Liana Fiol Matta
                                        Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Jorge Colón Ortiz<br>Peticionario<br><br>v.<br><br>Asociación de Condómines Borinquen Towers I, Junta de Directores del Condominio Borinquen Towers<br>Recurridos<br>_____<br>Consejo de Titulares y/o Junta de Directores de la Asociación de Condómines del Condominio Playa Dorada<br>Recurridos<br><br>v.<br><br>Yolanda Candelario<br>Peticionaria | CC-2010-277<br><br><br>cons.<br><br><br><br>CC-2010-616 | *Certiorari* |

*SENTENCIA*

En San Juan, Puerto Rico, a 14 de junio 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, modificamos la sentencia dictada por el Tribunal de Apelaciones en el caso CC-2010-616 a los efectos de que procede la acción en cobro de dinero por la cantidad pagada en concepto de la mesada, mas no las sumas pagadas por concepto de vacaciones, enfermedad y bono de navidad. Además, confirmamos la decisión del Tribunal de Apelaciones en el caso CC-2010-277.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Pabón Charneco concurre con el resultado de la Opinión ya que se resuelve correctamente que la figura del Agente Administrador en el Régimen de Propiedad Horizontal es un mandatario del Consejo de Titulares. No obstante, considera innecesarias las menciones de tratadistas

españoles en la Parte II de la Opinión que critican esa conclusión. Entiende que ello puede abonar a una confusión en futuros casos ya que el resultado de la Opinión es contrario a lo expuesto por estos tratadistas. El Juez Asociado señor Rivera García no interviene.


                         Aida Ileana Oquendo Graulau
                         Secretaria del Tribunal Supremo